# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KAREN GREENLEE,                          :
                                         :
            Plaintiff,                    :
                                         :
      v.                                  :          Civ. No. 07-630-LPS
                                         :
MICHAEL J. ASTRUE,                       :
Commissioner of Social Security,          :
                                         :
            Defendant.                    :

_____

Stephen A. Hampton, GRADY & HAMPTON, L.L.C., Dover, Delaware, Attorney for Plaintiff.

Colm F. Connolly, United States Attorney, Patricia Anne Stewart, Special Assistant United States
Attorney, and Dina White Griffin, Special Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Wilmington, Delaware; Michael McGaughran, Regional Chief
Counsel, and Shawn C. Carver, Assistant Regional Counsel,  SOCIAL SECURITY
ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

## MEMORANDUM OPINION

December 30, 2008
Wilmington, Delaware

**STARK, U.S. Magistrate Judge**

# I. INTRODUCTION

Plaintiff Karen Greenlee ("Greenlee") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405 (g).

Presently pending before the Court are cross-motions for summary judgment filed by Greenlee and the Commissioner. (D.I. 18, 22)   Greenlee asks the Court to reverse defendant's decision and award her DIB dating back to her alleged onset of disability, or in the alternative, to remand for further proceedings before a different Administrative Law Judge ("ALJ"). (D.I. 24 at 2)   The Commissioner's motion requests that the Court affirm his decision. (D.I. 22)   For the reasons set forth below, Greenlee's motion will be granted in part and denied in part and the Commissioner's motion will be denied.

# II. BACKGROUND

## A.    Procedural History

Greenlee filed an application for DIB with the Social Security Administration on March 18, 2005. Tr. at 66-68. The application was denied initially on July 11, 2005 and again on reconsideration on December 19, 2005. Tr. at 40-44, 47-51. The appeals hearing was held before ALJ Judith Showalter on February 22, 2007. Tr. at 405-43. Greenlee, who was represented by counsel, testified, as did her mother and a vocational expert. *Id.* On May 4, 2007, the ALJ issued a partially favorable decision, finding that prior to October 1, 2006 Greenlee was not disabled

1

within the meaning of the Social Security Act, but that she became disabled on that date and continued to be disabled through the date of the ALJ's decision. Tr. at 31. Greenlee requested review of the ALJ's decision from the Social Security Appeals Council on June 1, 2007. Tr. at 14. On September 18, 2007, the Appeals Council denied her request for review. Tr. at 5-7. Thus, the ALJ's partially favorable decision became the final decision of the Commissioner. *See* C.F.R. §§ 404-955; *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On October 15, 2007, Greenlee filed a Complaint seeking judicial review of the ALJ's May 4, 2007 decision. (D.I. 1) The parties consented to the jurisdiction of the undersigned United States Magistrate Judge on February 1, 2008. On April 14, 2008, Greenlee moved for summary judgment. (D.I. 18) The Commissioner filed a cross-motion for summary judgment on July 14, 2008. (D.I. 22) Briefing on the cross-motions was completed on July 23, 2008. (D.I. 24)

**B.      Factual Background**

**1.      Greenlee's Medical History, Treatment, and Condition**

At the time she filed her DIB application in March 2005, Greenlee was forty-four years old. Tr. at 122. She has a vocational high school diploma, which did not require her to pass reading, writing, and math tests. Tr. at 85-86. Upon graduating high school at age twenty, Greenlee was briefly employed as a maid at Dover Air Force Base, but was fired because she could not learn to make beds properly. *Id.* Her father, an elementary school principal in the Caesar Rodney School District ("District"), helped her obtain a position with the District as a custodian, beginning in 1980 or 1981. *Id.* Greenlee claims to have been disabled since August 1, 2003, when she slipped on a wet floor at work and fell on the posterior aspect of her right elbow. Tr. at 83. It is undisputed that Greenlee suffers from "mental limitations" as well. (D.I. 22

(Commissioner's Brief) at 25; *see also* D.I. 24 at 1 (Plaintiff noting her "severe mental impairments"); Tr. at 22 (ALJ referring to Plaintiff's "borderline intellectual functioning"))

### a.   August - September 2003

Greenlee was given an initial orthopedic evaluation at Dickinson Medical Group on August 5, 2003. Tr. at 341. She showed some tenderness to palpation along the olecranon and distal aspect of her right arm, with mild swelling. *Id.* Greenlee reported that her pain had "gotten a little bit worse" since the onset of injury, and was placed in a posterior splint. *Id.* Elbow x-rays showed no fracture. *Id.*

On August 18, 2003, an MRI of her right elbow showed a high signal of the radial collateral ligament with subjacent fluid. Tr. at 314.

On September 9, 2003, Greenlee was evaluated at Kent General Hospital. She reported a history of headaches "associated with cognitive impairment and tinnitus." Tr. at 163. An MRI of her brain was negative, but tests indicated degenerative disc disease. Tr. at 164, 171-72.

By September 11, 2003, Greenlee's pain was "more localized to the lateral epicondyle area radiating down the distal forearm," and she was administered Lidocaine injections in her right elbow. Tr. at 337-38. She was seen by Dr. Thomas Volatile at Dickinson Medical Group, who found tenderness radiating down from the lateral epicondylar area to the proximal aspect of her right forearm. Tr. at 336. Dr. Volatile's treatment notes from September 23, 2003 state that six weeks after her elbow injury, treatments had been "exhausted" and Greenlee's x-rays and MRI and EMG studies had all come back normal. *Id.* He referred her to an orthopedic surgeon. *Id.*

### b.   October - December 2003

On October 9, 2003, Greenlee was evaluated by orthopedic surgeon Dr. Richard

3

DuShuttle, who noted the full range of motion of her right elbow, positive tenderness over her right lateral epicondyle, and pain with resisted extension of her right wrist. Tr. at 314. He gave her a wrist splint, instructed her to remove it only when bathing, and restricted her to "one-handed light duty only" at work. Tr. at 315. Three weeks later, on October 30, Greenlee told Dr. DuShuttle that her condition was unchanged and she was in pain. Tr. at 312. The doctor put her chances at improvement with surgery at 85%, and Greenlee agreed to surgery for her traumatic right lateral epicondylitis. *Id.* Her restriction to one-handed light duty at work was extended until her operation. Tr. at 329. On November 5, 2003, Dr. DuShuttle performed lateral epicondyle release surgery on Greenlee's right elbow, and restricted her from work until at least her next re-evaluation one week later. Tr. at 175, 328.

The results of Greenlee's surgery were initially encouraging. At her first post-operative appointment on November 12, 2003, she reported that she was having no problems since surgery, and that the pain she had experienced prior to her operation was gone. Tr. at 310. She noted that she was not currently working. *Id.* However, one week later, Greenlee told Dr. DuShuttle that she was experiencing greater discomfort in her right arm and was dropping items with her right hand. Tr. at 308. She acknowledged using her right hand more than was recommended. *Id.* She was advised to use her hand differently, continue on a wrist splint and medication, and stay off work until re-evaluated. *Id.* On December 5, 2003, Greenlee reported to Dr. DuShuttle that her right elbow symptoms were "unchanged," but she was back to working regular duty. Tr. at 306. On examination, he noted "tenderness at the tip of the olecranon which is different than her previous symptoms." *Id.* She was advised to "refrain from lifting" and given medication, a prescription for physical therapy, and "a no work note until re-evaluated in three weeks." *Id.*

4

### c.  December 2003 - January 2004

On December 16, 2003, Greenlee began post-operative physical therapy for right lateral epicondylitis, post-right epicondyle release, and olecranon bursitis.  Tr at 177.  She reported to her therapist that she was unable to hold things with her right hand and was scared to do so after spilling a cup of coffee.  *Id.*  She complained of numbness from wrist to elbow, and rated her pain as "6-9/10."  *Id.*  The therapist noted that Greenlee was "wearing a wrist splint at all times; however, she does do ceramics and states that she takes it off so she can paint her ceramics.  She . . . is only able to paint for 20 minutes before pain increases and she needs to put the brace back on."  *Id.*  She scheduled Greenlee for three therapy sessions a week for three weeks.  *Id.*

On December 26, 2003, Greenlee reported to Dr. DuShuttle that her right arm continued to hurt every day and her symptoms had not improved.  Tr. at 304.  She showed positive pain on her grip strength and upon resisted wrist extension, with no neuro or sensory deficits.  *Id.*  She was given medication and advised to stop therapy because of the continuing discomfort in her right arm.  *Id.*  She was further restricted from work until at least her next re-evaluation.  Tr. at 324.

Greenlee returned to Dr. DuShuttle's office several times in January 2004, where she was treated each week with myofascial release therapy on her right lateral epicondyle.  Tr. at 298-302.  She reported a favorable difference in her feelings of pain immediately after each therapy session.  Tr. at 298, 302, 303.  However, upon her weekly return, Greenlee felt that she had experienced only "mild improvement" (January 12), "minimal change" (January 19), and no change (January 23) between appointments.  *Id.*  She also noted that she was not attending physical therapy.  *Id.*  On January 6, 2004, she stated she was not working, and her treatment notes stated that she "will be off work until re-evaluated."  Tr. at 303.  Her "no work" restriction was subsequently extended

5

through January 30.  Tr. at 319

Greenlee was discharged from physical therapy on January 16, 2004 due to lack of attendance and follow-up.  Tr. at 176.

### d.    February - March 2004

On February 3, 2004, Greenlee returned to Dickinson Medical Group, where she met with orthopedic surgeon Dr. Andrew P. Robinson.  Tr. at 335.  She reported right elbow pain with any lifting; tingling and numbness radiating from dorsal forearm to the dorsum of the hand; and hand weakness.  *Id.*  On examination, she showed minimal tenderness over her lateral epicondyle, excellent strength on resisted wrist or thumb extension, subjective diminution to light touch in the distribution of the superficial radial nerve distally, and exquisite tenderness on palpation of the radial tunnel.  *Id.*  Dr. Robinson concluded that Greenlee suffered from probable occult radial nerve entrapment and status post lateral epicondylar release and referred her to Dr. Peter Townsend for a second opinion and possible surgery.  *Id.*

On March 9, 2004, Greenlee was examined by Dr. Townsend at the Delaware Orthopaedic Center.  Tr. at 178.  She had stiffness on overhead reach of her right shoulder with pain on internal and external rotation, tenderness to palpation throughout her upper extremity, a full range of motion with marked pain on terminal elbow extension and flexion, and marked tenderness over the incision over the lateral aspect of her right arm.  *Id.*  Dr. Townsend's impression was that she demonstrated "a complex regional pain syndrome, for which [he] did not feel a second surgical procedure would be helpful."  *Id.*  He referred her to a pain center for treatment.  Tr. at 179.

### e.    March - May 2004

On March 16, 2004, Dr. Asit P. Upadhyay, the osteopathic doctor to whom Greenlee was

6

referred, found tenderness in her right elbow, a normal wrist range of motion, and no atrophy of her hand intrinsics. Tr. at 183-84. Dr. Upadhyay noted in his report that Greenlee "has pain with most activities" but was nevertheless "working full-time without restrictions" and "doing heavy lifting [although] she has been guarding the right upper extremity significantly." Tr. at 182, 184. He concluded that "she would be best suited working at light duty with no repeat use of the right arm." Tr. at 184. He started Greenlee on a new course of medication and recommended a more specific course of rehabilitation. *Id.*

On March 25, 2004, Greenlee was examined by orthopedic surgeon Dr. Glen Rowe, who found allodynia over her right forearm, hypersensitivity to light touch over her right dorsal forearm and hand, no hypersensitivity on her right volar forearm, and a positive Tinel's at the right elbow. Tr. at 187. The diagnosis was "possible early complex regional pain syndrome, right upper extremity" and "causalgia, right radial nerve." Tr. at 188. He opined that her problem stemmed from "nerve irritation more so than the lateral epicondylitis, because she is very strong with strength testing, but complains more . . . of hypersensitivity." *Id.* He found that "she could do a light duty job with no lifting more than 20 pounds if available, if not available then no work." *Id.*

On April 15, 2004, Greenlee saw Dr. Eugene E. Godfrey of the Delaware Surgery Center, who performed a stellate ganglion block with C-arm guidance on her right arm. Tr. at 185. Following the procedure, her pain was markedly reduced. *Id.* Dr. Godfrey recommended repeat ganglion blocks because the first appeared to help her and "supported her diagnosis of an RSD.[reflex sympathetic dystrophy]." *Id.* She returned on April 26, reporting "that she got a little relief from the first Stellate and none from the second." Tr. at 190. Dr. Godfrey's clinical

7

impression was that Greenlee was not suffering from an RSD but instead from synovitis/tendosynivitis. *Id.*

On May 3, 2004, Greenlee returned to Dr. Rowe, reporting that her right upper extremity had worsened. Tr. at 186. His diagnosis was "causalgia, right radial nerve." *Id.* He did not feel that she had RSD because of the localized nature of her pain. *Id.* Greenlee was referred to Johns Hopkins for nerve causalgia evaluation, given "a note for one arm duty" at work, and advised to seek counseling for residual feelings of resentment at her boss for contributing to her injury. *Id.*

On May 12, 2004, Greenlee informed Dr. Godfrey that a recent set of injections in her right elbow had not helped her and had, in her opinion, made her pain worse. Tr. at 189. Dr. Godfrey concluded that Greenlee's condition was "a long-term situation" and that he could offer her nothing beyond pain management with medication. *Id.* He anticipated no change in her condition beyond a "gradual deterioration of the area." *Id.*

### f. August - December 2004

On August 11, 2004, Greenlee was in an automobile accident and, thereafter, began experiencing pain in her neck, lower back, and right shoulder. Tr. at 333. Diagnostic imaging showed no fracture of her cervical spine. Tr. at 196. Two weeks after the accident, she was seen by Dr. Robinson, who diagnosed her with cervicolumbar sprain/strain, right shoulder impingement, and possible post-traumatic carpal tunnel syndrome. Tr. at 334. Her back, shoulder, and hand symptoms were unchanged as of September 20, 2004. Tr. at 332. Dr. Robinson did not rule out post-traumatic carpal tunnel syndrome. *Id.*

Greenlee saw her personal physician Dr. Frederick Van Dusen nine times between September and December 2004, for issues related to diabetes, an ovarian cyst, and tremors in her

8

legs. Tr. at 254-62. His notes do not indicate that her right arm impairment was discussed at any of these appointments. *Id.*

### g.     March 2005

On March 16, 2005, Greenlee returned to Dr. Van Dusen, who noted that her recent treatment at Johns Hopkins for her right radial neuropathic pain had brought her "very limited relief." Tr. at 250. Greenlee also reported insomnia, for which she was given Ambien. *Id.* A week later, Dr. Van Dusen detected elements of RSD and prescribed Lidoderm patches for the pain. Tr. at 249. By March 30, Greenlee reported that the patches had not helped and that even light touch to her elbow caused her extreme pain. Tr. at 248.

Greenlee filed her DIB application with SSA on March 18, 2005. Tr. at 66-68. On March 21, 2005, Dr. Van Dusen completed a disability form stating that Greenlee suffered from RSD, diabetes, and a learning disability, and that her prognosis was poor. Tr. at 252. He noted that Greenlee was having difficulty "lift[ing] anything. For this reason, she is now applying for disability, having been laid off her job as [a] school custodian." Tr. at 249.

On May 23, 2005, an MRI of Greenlee's right elbow was normal. Tr. at 278.

### h.     May 2005

On May 5, 2005, Greenlee was interviewed by the Social Security Office for a Disability Field Report. The interviewer found that Greenlee had difficulties understanding and answering, and had "provided conflicting medical information in several instances, but did not appear to understand discrepancies even when they were pointed out to her. . . .  [Further,] she stated that her maiden name was misspelled on forms, but when asked to spell it, she spelled it as written." Tr. at 94. Greenlee was found to have no difficulties reading or writing (she informed the

9

interviewer that she could read and understand English and could write more than her name) and no difficulties using her hands (she "signed 13 medical releases without apparent difficulty"). Tr. at 94, 96. However, Greenlee informed the interviewer that she could not use her right arm to pick up objects "at all," and that even wearing a long-sleeved shirt was painful for her. Tr. at 97.

In a May 9, 2005 Pain Questionnaire, Greenlee stated that she experienced pain in her right arm "all the time day & night," and that no medication or therapy had helped her. Tr. at 105. In her Function Report, she reported hobbies including doing puzzles with her left hand, caring for her dog and guinea pigs, visiting with her family, and shopping. Tr. at 107-08, 111. She also stated that she shared cooking duties with her husband but relied on her left hand to prepare meals. Tr. at 108-09. She relied on her left hand to perform her personal grooming routine. Tr. at 108. She checked boxes indicating that her disability affected her memory and concentration as well as her ability to lift, reach, complete tasks, and use her hands. Tr. at 112. She indicated that she completed the form with help from her mother. Tr. at 114.

### i.    June 2005

On June 8, 2005, an unidentified state agency physician consultant completed a physical residual functional capacity ("RFC") assessment form for Greenlee. Tr. at 198. This physician checked boxes indicating, among other things, that Greenlee could occasionally lift twenty pounds and frequently lift ten pounds; was limited to occasional use of her right upper extremity to push and pull; was limited in her handling and fingering ability but unlimited in her ability to reach in all directions; and was limited in her ability to endure concentrated exposure to cold. Tr. at 198-204. The physician noted a perceived "problem w/ accurate info (credibility)," and concluded that Greenlee's maximum RFC was for light work with occasional use of her right upper extremity.

10

Tr at 205-06.

###### j.     June - July 2005

On June 29, 2005, Greenlee was given a cognitive functioning assessment by Joseph B. Keyes, Ph.D., to assist in the disability determination. Tr. at 229. On evaluation, Keyes found Greenlee's thinking to be "organized and relevant to the situational context" but with "significantly below average/normal abstract skills" and difficulty with verbal reasoning and conceptual tasks. Tr. at 230. She could count backwards from twenty and recite the alphabet but could not perform serial threes. *Id.* Her verbal IQ was tested at 63, performance IQ at 79, and her full scale IQ at 67, "indicating cognitive functioning in the borderline to extremely low functioning range." Tr. at 231-32. Keyes noted "a significant difference between [Greenlee's] verbal based skilled functioning and performance based skill functioning," with her verbal comprehension and working memory "in the extremely low range . . . represent[ing] relative weaknesses." Tr. at 232. She was found to be capable of self-care, performing the basic activities of daily living, and managing her own funds. Tr. at 232-33. The diagnostic impression was learning disorder (language based) with a non-specified dysthymic disorder. *Id.* Her Global Assessment of Functioning was 60-65. Tr. at 233. Keyes did not address whether or not Greenlee's limitations precluded her from working.

On July 8, 2005, Pedro Ferreira, Ph.D., a state agency psychological consultant, found that Greenlee was moderately limited in her activities of daily living; mildly limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; and moderately limited in her ability to understand, remember, and carry out detailed instructions. Tr. at 219, 223. He noted her history of special education and "apparent learning disability," but

11

concluded that Greenlee's cognitive and emotional limitations did not preclude her from

performing simple, low stress, repetitive work.  Tr. at 225.

### k.     August 2005 - January 2006

In an August 16, 2005 Disability Report, Greenlee reported no change in her condition

since her May 5 Disability Report.  Tr. at 115.

On December 1, 2005, Greenlee was examined on behalf of the State by Dr. Jack Dilts.

Tr. at 292-94.  He noted that she had seen no significant improvement since her November 2003

ulnar nerve transposition surgery; that physical therapy and a nerve block had failed to improve

her symptoms; and that she had difficulty with sedentary fine motor activities like knitting, cross-

stitching, and buttoning buttons.  Tr. at 292, 294.  On examination, he found mild sensory loss

over the right ulnar distribution in her right hand, right arm pain ranging "from 3-8," resting pain

"of 2-3," increased pain "with even the slightest of movements," no significant joint pain in the

right hand or wrist, 20% grip strength in the right hand and 90% grip strength in the left.  Tr. at

293-94.  His diagnosis was "[s]evere neuritis of the right ulnar nerve distribution [and] probably

permanent nerve injury." *Id.*  Dr. Dilts did not offer an opinion as to whether Greenlee was

disabled within the meaning of the Social Security Act.

### l.     January 2006

On January 10, 2006, the State of Delaware Industrial Accident Board (IAB) conducted a

hearing on a petition by the State to terminate the workers' compensation benefits Greenlee had

been collecting, following her injury in August 2003.  Tr. at 83.  On January 19, 2006, the IAB

denied the State's petition, finding that Greenlee could not read, write, pronounce words, do math,

or "tell how much things cost at the store;" "was able to do her job for so long [only] because her

12

boss would tell her when something was wrong, take her to it, and tell her to redo it;" could not

tell time; attended Delaware Technical and Community College to improve her reading, but had

not advanced beyond Dr. Seuss books and then "lost hope" and left school; was not sure what

kind of car she owned; and "is able to learn how to do some things if someone teaches her five to

ten times." Tr. at 86-88. While there was "no dispute in the medical testimony that [Greenlee] is

physically capable of working in a sedentary to light duty capacity," the Hearing Officer rejected a

labor market survey prepared by the State's vocational expert that found she would be capable of

handling a job as a greeter or a hostess, given "the fast pace that is required at times" by those

positions. Tr. at 89-90. The IAB concluded that Greenlee was *prima facie* a displaced worker

and, therefore, remains totally disabled." Tr. at 90.

### m.    January - April 2006

On January 19, 2006, Greenlee returned to Dr. Robinson for evaluation. Tr. at 384-85.

His diagnosis was persistent lateral epicondylitis and probable radial nerve entrapment; he

referred her for an EMG. *Id.* On January 30, 2006, the EMG confirmed radial nerve entrapment

on the right side, bilateral median neuropathy, left greater than right, and bilateral brachial

plexopathies. Tr. at 392-98. Dr. Robinson recommended that, given the complexity of her case,

Greenlee get a neurosurgical consultation at Johns Hopkins. Tr. at 383. A February 28, 2006

MRI of the right brachial plexus was unremarkable. Tr. at 382. On March 27, 2006, Dr.

Robinson noted that "some [ ] issue" prevented Greenlee from obtaining a second opinion at

Johns Hopkins. *Id.* Greenlee was then referred to Dr. Kennedy Yalamanchili at Delaware

Neurosurgical Group, who, on April 17, 2006, diagnosed her with brachial plexopathy, radial

nerve entrapment, and carpal tunnel syndrome. Tr. at 382, 388. Other findings included evidence

13

of weakness involving the right hand intrinsic muscles rated at 4+/5, evidence of sensory distribution deficit involving primarily the radial nerve distribution in the right arm, and evidence of compromise of the brachial plexus on both sides. Tr. at 390. Surgical release of the radial nerve at the radial tunnel was suggested, but Greenlee's likelihood of recovery was deemed modest. *Id.*

### n.  May - August 2006

In a May 12, 2006 Social Security Update, Greenlee reported pain and limitations related to her "head and neck" and "shoulders, arms, and hands," as well as sleepiness, difficulty eating, and unspecified limitations performing work activities and hobbies. Tr. at 147-48. By August 18, 2006, she was no longer reporting head and neck pain. Tr. at 150.

On August 29, 2006, Dr. Robinson stated on a medical evaluation form that Greenlee was "unable to perform essentially ANY vocational tasks with [her] right hand/wrist/arm, likely on a permanent basis," and that she suffered from complex regional pain syndrome. Tr. at 331.

### o.  October - November 2006

Greenlee returned to Dr. Robinson on October 12, 2006 and reported that, two weeks earlier, she had "sustained a ground level fall on to an outstretched hand and since then has had elbow pain as well as tingling and numbness throughout the [left] hand." Tr at 379. Dr. Robinson's diagnosis was multifactorial left upper extremity pain with probable acute carpal tunnel syndrome. *Id.* He referred Greenlee for another EMG nerve conduction study for both sides. *Id.*

On November 15, 2006 an EMG was performed by W. James Downs, P.T., D.Sc., E.C.S., of Tidewater Electromyography. Tr. at 345. Greenlee told Downs that she was experiencing

14

tingling of the left hand, including all fingers; often used her left hand for craftwork and driving

her disabled husband, and was afraid of getting in an auto accident; had been primarily relying on

her left hand for all activities since her November 2003 right elbow surgery failed to bring her

relief; and that her left hand problems started about two months previously. *Id.* Motor

examination showed pain-limited strength on both sides, normal strength in the upper left

extremity but resisted left wrist and forearm function yielding numbness and tingling in the

fingers, pain-limited right wrist extension and flexion, and pain-limited right forearm prontation.

*Id.* The EMG showed markedly delayed distal latency across the left wrist "with considerable

progression since the last examination of 1/30/06." Tr. at 347. Downs concluded that the EMG

was "now suggestive of a very marked compromise in the function of the left median nerve . . .

with evidence of chronic dysfunction." Tr. at 349. There was also "now evidence of a moderate

to marked compromise in the function of the right median nerve across the wrist with some

progression in median sensory fiber dysfunction to the thumb since the last examination." *Id.*

Dr. Robinson informed Greenlee that the severity of the progression was, in his opinion,

directly attributable to the loss of function in her right upper extremity. Tr. at 378. On November

21, 2006, he recommended left-side carpal tunnel release surgery as soon as practicable. *Id.*

### p.   January - February 2007

Dr. Robinson performed left carpal tunnel release surgery on January 8, 2007. Tr. at 372.

He told Greenlee that she would probably also need carpal tunnel release performed on her right

side at some point in the future and that her right-side symptoms would likely worsen in the

meantime. Tr. at 377. By February 1, 2007, the numbness, tingling, and clumsiness in Greenlee's

left hand were gradually improving, and she had full composite fist formation, moderate

15

sensitivity, and full sensation. Tr. at 370.[1]

## 2.   The Administrative Hearing

At Greenlee's administrative hearing, the ALJ heard the testimony of Greenlee; her

mother, Joyce Knarr; and Tony Melanson, an impartial vocational expert. Tr. at 405-43.

### a.   Greenlee's Testimony

Greenlee testified that she had a high school education and received special assistance

with her classwork from second grade through high school. Tr. at 412. Her high school diploma

was a vocational diploma that did not require her to pass reading and writing tests in order to

graduate. Tr. at 424-25. She was employed by the State of Delaware as a public school custodian

from 1986 until 2004, a job that required her to stand and walk all day, and to lift "[b]etween 50

and 100 pounds." Tr. at 412. Her father, who was at the time of her hiring the principal of Welch

Elementary School in the District, helped her obtain the position. Tr. at 426.

Greenlee further testified that she became disabled on August 1, 2003, when she slipped

and fell on her elbow while stripping floors at work. Tr. at 413. She received disability benefits

from the State related to her injury and had not worked since 2003. *Id.* She could no longer work

because she "cannot lift anything," even a cup of coffee. Tr. at 414. She could not hold a

telephone to her ear for five minutes before dropping it. *Id.* She took pain pills every day for her

right arm, but did not know the name of her medication. *Id.* She stated that she could not stretch

her right arm out in front of her and could not lift it above her head "that much." Tr. at 415. She

---

[1]In an unsigned, undated Vocational Analysis, Greenlee was declared "not disabled" but physically restricted to only occasional use of the right upper extremity and mentally restricted to simple, low-stress, repetitive work. Tr. at 153. The form listed "school bus monitor," "barker," and "host/hostess, head," as jobs she could perform within these restrictions. Tr. at 154.

went to physical therapy in 2004 but stopped going because it did not help. Tr. at 414-15. She
considered the severity of the pain in her right arm to be a ten on a ten-point scale. Tr. at 415. At
her request, her doctors would sometimes prescribe her a new pain medication, which would only
help "for a couple of days." Tr. at 416. She could not lift anything heavier than two pounds. Tr.
at 421.

Greenlee testified that she relies on her left hand to button and zip her clothing, pick up
coins, and count paper money. *Id.* She feeds herself with a knife and fork using her right hand
"sometimes," because she had started dropping things with her left hand as well. Tr. at 417.
Other times someone feeds her. *Id.* She must hold a cup with both hands to drink. *Id.* She drives
with her left hand and experiences numbness in both hands "all the time." *Id.* She drove herself
to the hearing using her left hand. Tr. at 411. Because she is right-handed and cannot write with
her left hand she still uses her right hand to make a grocery list, but writes quickly because she
tends to drop her pen. Tr. at 419. She shares cooking duties with her husband and can do laundry
and fold it, though her husband must carry the laundry to her. Tr. at 423.

Greenlee at one point testified that she was able to read and write. Tr. at 411. However,
she later noted that she could not fill out a job application because she "can't read the application .
. . . I see all the words backwards . . . . I don't understand half of them." Tr. at 419. She also
sees words backwards when trying to read a newspaper or magazine. Tr. at 425. Her mother
filled out all her Social Security-related and job-related forms. *Id.* She cannot read restaurant
menus and orders what she likes from memory or from a picture of the item on the menu. Tr. at
420. Asked by the ALJ to clarify her reading abilities, Greenlee testified that she could not read at
all. *Id.* She later acknowledged that she was taught to read Dr. Seuss books while attending

17

Delaware Tech and considers those books to be at about her reading level.  Tr. at 426.  She said that she cannot use a phonebook, sometimes loses her way when trying to follow directions, has never lived on her own, and does not feel that she is capable of living independently.  Tr. at 427.  She uses a calculator to add and subtract.  Tr. at 411, 426.  Both she and her husband pay their bills and keep track of money, but her husband must take care of the larger bills.  Tr. at 422-23, 426.  She usually uses a credit card to pay for items because she does not know how much things cost and cannot otherwise tell if she receives the correct change.  Tr. at 425.  She writes out checks by copying the words from another source.  Tr. at 425.

Greenlee testified that her memory is "not that good" and her concentration is poor.  Tr. at 421.  The longest she can sleep is four hours at a time.  Tr. at 422.  She and her husband rarely visit with relatives, eat out at restaurants occasionally, and do not attend religious services or participate in organizations.  Tr. at 423.  She does not socialize outside her family and is sometimes frightened of being around people she doesn't know.  Tr. at 427.  Her hobbies include watching television, shopping, playing with her dog, and – "if I have a good day" – cross-stitching.  Tr. at 423.

Greenlee further testified to having diabetes, high blood pressure, and high cholesterol, which are controlled by medication..  Tr. at 418.  As a side effect of her medication, she experiences upset stomach and drowsiness "all the time."  *Id.*  She was treated for asthma in the past, but was not at the time of the hearing on any medication for it.  Tr. at 421.

### b.    Knarr's Testimony

Greenlee's mother, Joyce Knarr, testified that her daughter "was always learning disabled in school," took special education classes, and graduated from high school at age twenty after

18

repeating two grades. Tr. at 430. She noticed that when Greenlee was working as a school janitor, notes Greenlee left for teachers did not always make sense; but still Knarr figured Greenlee could "probably" fill in the blanks on a job application on her own. *Id.* Knarr said that any letters from Greenlee "in her files" were composed and typed by Knarr. *Id.* She believed that her daughter reads at a fifth- or sixth-grade level. *Id.*

Knarr testified that Greenlee's janitorial position had required her to clean classrooms under time constraints at two different schools. Tr. at 431. After Greenlee's injury in 2003, her family was told that if Greenlee could not lift fifty pounds she could not have her job back. *Id.* Knarr gave her opinion that Greenlee would be able to perform her former job "if they didn't make her do the heavy lifting." Tr. at 433.

Knarr further testified that Greenlee complained daily that her right arm hurt, and that her pain medication did not usually bring her relief, but did make her sleep for twelve to fourteen hours at a time. Tr. at 432. She stated that Greenlee can use the fingers of her right hand, but that it hurt her to do so. *Id.* She was not aware of Greenlee needing any assistance with dressing or grooming. *Id.* Knarr said that her daughter could wash dishes and do laundry, but would drop items if she held them in her right hand. Tr. at 433. She stated that Greenlee does not socialize much, and that for recreation she goes to stores, on drives, or to the beach with her husband. *Id.* She believed that Greenlee was capable of performing these activities on her own. *Id.*

### c.   The Vocational Expert's Testimony

Vocational expert Tony Melanson testified that Greenlee's past relevant work as a custodian was heavy and unskilled. Tr. at 434-35. The ALJ asked Melanson to consider a hypothetical individual of Greenlee's age at the onset of her claimed disability (forty-two), with a

19

high school education, unskilled work background, and dominant right arm, who "would start first at a light level of exertion," with limited pushing and pulling in the right upper extremity, limited use of the right arm overhead, "frequent rather than constant" handling and fingering with the right hand, "frequent rather than constant work that would avoid a concentrated exposure to extremes in cold," who was unable to climb a ladder, rope, or scaffold. Tr. at 435. Melanson confirmed that such an individual could not perform Greenlee's past relevant work. *Id.*

The ALJ then asked Melanson whether the individual would be considered "sedentary" if she was able to lift at a light level with the non-dominant arm and at less than a light level with the dominant arm. Tr. at 435-36. Melanson answered that she would not, but that such an individual's limitations would not allow her to perform the full range of light work. Tr. at 435-36. The ALJ then asked Melanson to consider, if the hypothetical individual was "sedentary on the dominant hand and light on the other," whether light work existed that she could perform, given her other limitations. Tr. at 436. Melanson testified that such an individual could perform three jobs in the national and regional economy: usher/lobby attendant (for which 250 positions existed in the local economy, i.e., within a seventy-five mile radius of Greenlee's location in Dover, Delaware, and 70,000 nationally); gate tender (475 positions locally, 120,000 nationally); and unarmed, unskilled security guard or night watchman (800 positions locally, 95,000 nationally). Asked to further limit the individual to "limited reading and writing ability," Melanson testified that the usher/lobby attendant position would fully accommodate the individual, but that the available gate tender positions would be eroded by "about 75%" and the security guard positions

would be eroded by "about 90%."[2]  Tr. at 437.  Melanson also identified two more jobs: "machine

operator" (250 positions locally, 70,000 nationally) and "inspector-tester" (he did not state how

many such positions existed in the local and national economy, but acknowledged that "a number"

of positions would be eliminated because "there is some constant handling [required] there").  *Id.*

Melanson stated that his testimony regarding these positions was consistent with their descriptions

as found in the *Dictionary of Occupational Titles.*  Tr. at 438.

Melanson further testified that it was "probably true" that most usher/lobby attendant

positions were not full-time.  Tr. at 439-40.  He did not believe that an individual's receiving a

vocational diploma (as opposed to a "regular" high-school diploma) would impact an individual's

ability to obtain work as a security guard, unless "it said on there very specifically this is special

ed" because "it's really a matter of whether they are able to pass" a security guard examination.

Tr. at 441.  He acknowledged that if the ALJ found Greenlee's testimony as to her chronic

drowsiness credible, she would be precluded from working as a security guard, and that if the ALJ

found that Greenlee could not tell time (a finding made by the Industrial Accident Board), she

would be precluded even from work as a lobby attendant, gate tender, or security guard.  Tr. at

441-42.

### 3.    The ALJ's Findings

On May 4, 2007, the ALJ issued the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act
      through December 31, 2009.

---

[2]Thus, according to the vocational expert, a hypothetical individual with limited reading
and writing ability in addition to Greenlee's other limitations would only have available to her
locally about 120 gate tender positions and 80 security guard positions.

2.      The claimant has not engaged in substantial gainful activity since August 1, 2003, the alleged onset date (20 CFR 404,1520(b) and 404.1571 et seq.).

3.      Since the alleged onset date of disability, the claimant has had the following severe impairments: bilateral carpal tunnel syndrome, status post right arm injury, brachial plexopathy, radial nerve entrapment, and borderline intellectual functioning (20 CFR 404.1520(c)).

4.      Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

5.      After careful consideration of the entire record, the undersigned finds that, prior to October 1, 2006, the claimant had the residual functional capacity to stand/walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, lift up to 20 pounds occasionally with the left hand and less than 10 pounds frequently with the dominant right hand, limited pushing/pulling with the upper extremities, no climbing of ropes, ladders, or scaffolds, occasional crawling, frequent, rather than constant, handling and fingering with the dominant right hand, must avoid concentrated exposure to extreme cold, and is limited to simple, unskilled work which is not at a production pace.

6.      After careful consideration of the entire record, the undersigned finds that, beginning on October 1, 2006, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in the Dictionary of Occupational Titles, but, due to pain, the claimant has limited reliability and concentration such that she would be unable to perform sustained work activities in an ordinary work setting over an eight-hour day, five days a week, or an equivalent work schedule, on a regular and continuing basis, as defined at SSR 96-8p.

7.      Since the alleged onset date of disability, the claimant has been unable to perform past relevant work (20 CFR 404.1565).

8.      The claimant was born on August 16, 1960 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

9.      The claimant has a high school special education and is able to communicate in English (20 CFR 404.1564).

10.     Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 404.1568).

11.     Prior to October 1, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

12.     Beginning on October 1, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

13.     The claimant was not disabled prior to October 1, 2006, but became disabled on that date and has continued to be disabled through the date of this decision.

Tr. at 22-31.


## III.  STANDARD OF REVIEW

### A.     Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (internal citation and quotation marks omitted).  If the Court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56c).

### B.     Review Of ALJ Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

23

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v.*

*Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted,

substantial evidence "does not mean a large or significant amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce*

*v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the

evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d

Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed

on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3

(E.D. Pa. Jul. 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence –

particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

1983).

Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV. DISCUSSION

### A.     Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir.1999). If a finding of disability or non-disability can be made at any point in the sequential

process, the Commissioner will not review the claim further.  20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity.  *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-

disability when claimant is engaged in substantial gainful activity).  If the claimant is not engaged

in substantial gainful activity, step two requires the Commissioner to determine whether the

claimant is suffering from a severe impairment or a combination of impairments that is severe.

*See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's

impairments are not severe).  If the claimant's impairments are severe, the Commissioner, at step

three, compares the claimant's impairments to a list of impairments (the "listings") that are

presumed severe enough to preclude any gainful work.  *See* 20 C.F.R. § 404.1520(a)(4)(iii);

*Plummer,* 186 F.3d at 428.  When a claimant's impairment or its equivalent matches an

impairment in the listing, the claimant is presumed disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

If a claimant's impairment, either singly or in combination, fails to meet or medically equal any

listing, the analysis continues to steps four and five.  *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity ("RFC") to perform her past relevant work.  *See* 20 C.F.R.

§ 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work);

*Plummer,* 186 F.3d at 428.  A claimant's RFC is "that which an individual is still able to do

despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34,

40 (3d Cir. 2001).  "The claimant bears the burden of demonstrating an inability to return to her

past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the

26

Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B.     Greenlee's Arguments On Appeal

On appeal, Greenlee presents four arguments: (1) the hypothetical questions posed by the ALJ to the vocational expert failed to accurately describe her mental limitations in reading, writing, and math, the "functional limitations of her right hand and the pain she suffered as a result of her nerve injuries," and the limitation that her work could not be at production pace; (2) the ALJ failed to consider and evaluate the January 2006 finding of the Delaware Industrial Accident Board that she remained totally disabled from her August 2003 on-the-job injury, as required by SSR 06-03p; (3) there is no support in the record for the ALJ's finding that Greenlee was not fully credible concerning her impairment prior to October 1, 2006; and (4) the onset date of October 1, 2006 selected by the ALJ was arbitrary and not supported by the record, and the ALJ should have obtained medical testimony in determining the onset date.

27

### 1.     The ALJ's Hypotheticals Did Not Include All Limitations Found By The ALJ

The ALJ posed a series of hypothetical questions to the vocational expert, adding and

varying limitations.  Her most restrictive hypothetical asked whether light work existed that could

be performed by a forty-two-year-old individual with a high school education, unskilled work

background, and dominant right arm; with limited pushing and pulling in the right upper

extremity; limited use of the right arm overhead; who was sedentary on the right side and able to

lift at a light level on the left side; limited to frequent rather than constant right-handed fingering

and handling; needed to avoid concentrated exposure to extremes in cold; was unable to climb a

ladder, rope, or scaffold; and had limited reading and writing ability.  Tr. at 435-37.

Greenlee argues that the vocational expert's testimony could not provide a basis for the

ALJ's determination that she was not disabled prior to October 1, 2006 because the hypothetical

failed to include the ALJ's finding that Greenlee was limited to "simple, unskilled work which is

not at production pace." Tr. 24 (emphasis added).  Greenlee argues that if the hypothetical

contained this limitation, the vocational expert's response would have been that there is no work

in the national economy Greenlee could have performed, because "unskilled jobs do not allow the

worker to perform at her own pace.  Employers insist on a minimum level of performance and do

not allow workers to work at whatever pace suits them." (D.I. 18. at 21-22)

The Commissioner concedes that the ALJ's hypothetical did not contain this limitation,

but maintains that "only those limitations medically established and supported by the record . . .

must be reflected in a hypothetical question." (D.I. 22 at 25 (citing *Burns v. Barnhart*, 312 F.3d

113, 123 (3d Cir. 2002))  He argues that in limiting Greenlee to work that was not at a production

pace, the ALJ was merely giving her "the benefit of the doubt, and taking into consideration her

28

noted learning difficulties. . . . [M]edical evidence did not establish a production problem, and

. . . the jobs identified by the impartial vocational expert do not require a fast production pace."

(D.I. 22 at 26-27)

In finding Greenlee limited to non-production pace work, the ALJ stated that her

assessment was "[b]ased on Dr. Keyes' reported findings on consultative examination," which,

"in the absence of any record of mental health treatment," led her to conclude that Greenlee was

not precluded from simple, unskilled work that is "not at a production pace." Tr. at 28.

Following a clinical psychological evaluation, Dr. Keyes determined Greenlee's full scale IQ to be

67, "indicating cognitive functioning in the borderline to extremely low functioning range." Tr. at

231-32. The ALJ reasonably concluded from this assessment that Greenlee's "borderline to

extremely low functioning" precluded her from meeting a production pace. The Commissioner is

correct that the ALJ did not quote a medical opinion specifically describing Greenlee's inability to

meet a production pace, but the ALJ's finding in this regard is nonetheless supported by Dr.

Keyes' clinical evaluation, and, therefore, supported by substantial evidence.

It follows that the non-production pace limitation should have been included in the ALJ's

hypothetical. The hypothetical claimant described by the ALJ was mentally limited only by her

limited reading and writing ability, high school education, and unskilled work background. None

of these limitations, individually or in combination, focused the vocation expert on an individual

who could not perform work at a production pace.[3] Because the ALJ's questioning of the

---

[3]Greenlee also takes issue with the ALJ's not incorporating into the hypothetical the side effects from her pain medication, her inability to tell time, and her inability to use her right hand for any substantial activity. (D.I. 18 at 22) The Court is satisfied that, other than the production pace limitation discussed in the text, all of the medically-supported limitations found by the ALJ were incorporated in the hypothetical posed to the vocational expert.

vocational expert was, in light of her own findings, deficient, the vocational expert's testimony did not provide substantial evidence in support of the ALJ's conclusion that Greenlee was not disabled before October 1, 2006.

The Court is not persuaded by the Commissioner's suggestion that a more complete hypothetical would not have altered the vocational expert's testimony. Once a claimant has shown that she can no longer perform her past relevant work, the burden is on the Commissioner to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Plummer*, 186 F.3d at 428. Though the Commissioner opines that the three jobs identified by the vocational expert "do not require a fast production pace" (D.I. 22 at 27) (emphasis added), there is no evidence in the record to support of his view. Moreover, the ALJ's finding was that Greenlee was "limited to simple, unskilled work which is not at a production pace" – not just that Greenlee could not perform work at a fast production pace.

### 2.   The ALJ Adequately Considered The Findings Of The Delaware Industrial Accident Board

Greenlee argues that the ALJ did not sufficiently explain why she rejected the IAB Hearing Officer's conclusion that she was disabled prior to October 2006 and further rejected certain of the limitations the IAB found Greenlee suffered from. (D.I. 18 at 22-23) Greenlee also asserts that the ALJ failed to consider how the unique circumstances of her work history – the fact that she "only ever had one job in her entire life and it was a job arranged for her by her father at which her supervisor had to tell or show her everything she had to do because she could not comprehend written instructions"– further limit her ability to work. (D.I. 18 at 23) The Commissioner responds that the ALJ properly considered the IAB's decision and analyzed and

appropriately rejected those of Greenlee's alleged mental limitations that were accepted by the Hearing Officer.  (D.I. 22 at 20)  The Court concludes that the ALJ adequately considered the IAB's decision.

Social Security Ruling ("SSR") 06–03p describes how SSA adjudicators "consider decisions by other governmental and nongovernmental agencies on the issue of disability or blindness." 2006 WL 2329939, at *1 (Aug. 9, 2006).  SSR 06-03p explains that the SSA makes disability determinations based on Social Security law, so that "a determination made by another agency that you are disabled or blind is not binding on us." *Id.* at *6.  The final responsibility for deciding whether a Claimant is disabled is reserved to the Commissioner. *Id.*

> However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)).  Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.
>
> These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules.  We will evaluate the opinion evidence from medical sources, as well as 'non-medical sources' who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record. . . .

*Id.* at *6-*7.

SSR 06–03p allows that, because other agencies may apply rules and standards that are different from the SSA's regulations in determining whether a claimant is disabled, their relevance to the Commissioner's determination may be limited. *Id.* at *7.  "However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id.*

31

Here, the ALJ acknowledged her duty, pursuant to SSR 06-03p, to consider the opinion of the IAB in Greenlee's workers' compensation case. Tr. at 29. It is clear that the ALJ did consider the IAB decision – and rejected its finding of disability prior to October 2006. In rejecting the Hearing Officer's finding of disability, the ALJ relied in part on the medical opinions of Drs. Michael Shear and John B. Townsend that Greenlee was not disabled, Tr. at 29, neither of which appear anywhere in the record but as cited in the IAB opinion. The ALJ identified the reasons for her disagreement with the IAB in four medical opinions that the IAB Hearing Officer cited but did not accord significant weight: Dr. Rowe and Dr. Upadhyay's findings that Greenlee was capable of performing light duty work in March 2004; the IAB hearing testimony of Dr. Michael Shear that Greenlee "could perform light duty work with restrictions since at least March 2005;"[4] and the IAB hearing testimony of Dr. John B. Townsend that Greenlee was "capable of full-time light duty work with restrictions on use of her right arm."[5] Tr. at 29. The ALJ correctly pointed out that the Hearing Officer's decision was not binding on her, as opinions as to whether or not a DIB

---

[4]According to the IAB opinion, Dr. Shear is a "board-certified [specialist] in physical medicine and rehabilitation" who testified by deposition at Greenlee's IAB hearing on behalf of the State. Tr. at 83. The opinion states that Dr. Shear found that Greenlee was "physically capable"of performing the ten jobs listed on a labor market survey prepared by a state expert for purposes of the hearing, but he offered no opinion as to whether she was "mentally qualified" for any of them. Tr. at 84. Neither the date of Dr. Shear's deposition nor the full list of jobs in the survey was provided in the hearing officer's opinion. There is no other evidence referring to Dr. Shear in the record presently before the Court.

[5]The IAB opinion states that Dr. John B. Townsend is "a board-certified neurologist" who testified by deposition on the State's behalf. Tr. at 84. His opinion was based on an October 26, 2005 examination of Greenlee and a review of her medical records. *Id.* He is not to be confused with Dr. Peter Townsend, the orthopedic surgeon who diagnosed Greenlee with complex regional pain syndrome in March 2004. Tr. at 178-79. There is no record of the October 26, 2005 examination, nor any other reference to Dr. John B. Townsend, in the record presently before the Court.

claimant is disabled are reserved for the Commissioner, and that, given the different standards for

determining disability applied by different agencies, "the relevance of a determination of disability

by another agency is limited." *Id.* (citing 20 CFR 404.1527(e) and SSR 96-5p).

The ALJ was not required to explain why she was unpersuaded that certain factors in

Greenlee's background that were highlighted by the Hearing Officer – her graduation from high

school at age twenty with a special education degree; the fact that she "has never lived alone;" and

her work history, which consisted of losing her first job as a maid because she could not learn to

make beds, then not obtaining another position until her school principal father helped her find

employment in his District, Tr. at 86-89 – merited special consideration in determining whether

she was disabled. It would be an unduly narrow construction of SSR 06-3p to require an ALJ to

parry at length with another agency's analysis, in order to show that the ALJ had considered the

other agency's decision.

### 3. The ALJ's Finding That Greenlee Was Not Entirely Credible Is Supported By Substantial Evidence

The ALJ found that Greenlee was not entirely credible. Tr. at 26. After summarizing

Greenlee's and her mother's testimony at the administrative hearing, the ALJ concluded that

Greenlee's "medically determinable impairments could reasonably be expected to produce the

alleged symptoms, but . . . the testimony presented concerning the intensity, persistence and

limiting effects of these symptoms are not entirely credible prior to October 1, 2006." Tr. at 26.

In support of this finding, the ALJ noted that Greenlee admitted to performing daily activities that

were inconsistent with her complaints of functional limitations and unrelenting pain – citing one

example prior to October 1, 2006 (driving herself to her June 2005 cognitive evaluation with Dr.

Keyes) and one example after October 1, 2006 (telling the physical therapist who performed her EMG in November 2006 that she was able to use her left hand for driving and craft work). Tr. at 28. Nor did the ALJ appear to find Greenlee's testimony as to the current level of severity of her symptoms to be credible, noting that she observed Greenlee raise her right arm to be sworn in at the hearing without any apparent difficulties, and to lean on her right arm during the hearing without any apparent discomfort. Tr. at 28. Despite these purported inconsistencies, the ALJ ultimately concluded that, beginning on October 1, 2006, Greenlee's "allegations regarding her symptoms and limitations are generally credible." Tr. at 29.[6]

Greenlee argues that there is no substantial evidence to support the ALJ's finding that she was not fully credible concerning her impairment prior to October 1, 2006. (D.I. 18 at 20, 24-25; D.I. 24 at 1-2) An ALJ's credibility determination is entitled to great deference. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). Here, although there is not substantial evidence to support the ALJ's selection of October 1, 2006 as the disability onset date (a point discussed in greater detail in the next section), there is substantial evidence to support the ALJ's conclusion that Greenlee was not entirely credible.

Of particular relevance on this point is the fact that, although Greenlee testified that she has not worked for pay since 2003, Tr. at 413, her testimony is amply contradicted by other evidence in the record. While the ALJ, seeking to give Greenlee "every possible benefit of the

---

[6]The ALJ stated that "beginning on October 1, 2006 [Greenlee] has had the residual functional capacity to perform a range of sedentary work . . . but, due to pain, [Greenlee] has limited reliability and concentration such that she would be unable to perform sustained work activities in an ordinary work setting . . . as defined at SSR 96-8p." Tr. at 29. The Court reads this to mean that, in the ALJ's view, Greenlee retained the residual functional capacity to work after October 1, 2006, but that Greenlee is entitled to a finding of disability thereafter nonetheless because her allegations as to her "pain" became credible on that date.

doubt," Tr. at 22, accepted Greenlee's testimony – finding that Greenlee had "not engaged in substantial gainful activity since August 1, 2003," *id.*[7] – she noted elsewhere in the opinion that on December 5, 2003, Greenlee told Dr. DuShuttle that she was "currently working regular duty," Tr. at 26. The ALJ further noted that the IAB opinion documented that Greenlee "was released to light duty work by both Dr. Rowe and Dr. Upadhyay in March 2004." Tr. at 29. A review of the record makes clear that on March 16, 2004 Greenlee was "working full-time without restrictions," including "doing heavy lifting [although] she has been guarding the right upper extremity significantly." Tr. at 182, 184. Furthermore, on May 3, 2004, Dr. Rowe reported giving Greenlee "a note for one arm duty" at work, although he did not state definitively whether or not Greenlee was working. Tr. at 186.

Additionally, as Greenlee herself emphasizes, the record shows that she has had difficulty throughout the application process accurately providing all the information required by the SSA. In both her opening and reply briefs, she cites to the notes of an SSA interviewer, who observed in 2005:

> [Greenlee] provided conflicting medical information in several instances, but did not appear to understand discrepancies even when they were pointed out to her. She stated that her maiden name was misspelled on forms, but when asked to spell it, she spelled it as written.

(D.I. 18 at 3 (citing Tr. at 94); D.I. 24 at 2 (same)) Although it is unclear to what extent, if any, Greenlee's diminished mental capacity made her a less than fully persuasive witness for herself, the fact remains that there is substantial evidence for the ALJ's credibility determination.

---

[7]The ALJ also noted that the record shows Greenlee had earnings of nearly $10,000 in 2004. Tr. at 22. However, Greenlee insisted this was disability pay and, despite the absence of written verification, the ALJ gave Greenlee "every possible benefit of the doubt" and assumed Greenlee did not have earnings from substantial gainful activity in 2004. *Id.*

4.    **The ALJ's Decision That The Onset Date For Greenlee's
Disability Is October 1, 2006 Is Not Supported By Substantial Evidence**

Greenlee takes issue with the ALJ's conclusion that she did not become disabled until

October 1, 2006, on or about the date[8] she fell on her outstretched left hand, but a full thirty-eight

months after her August 1, 2003 fall on her right elbow.  (D.I. 18 at 25-26)  She argues that the

left-side carpal tunnel syndrome diagnosed in the aftermath of her October 2006 fall "obviously,

did not suddenly appear" on October 1, 2006.  (D.I. 18 at 20)  It follows, according to Greenlee,

that the ALJ was required to obtain medical testimony to identify the onset date for a disability

resulting from pain due to a medical condition that developed over time.  *Id.*

The Commissioner responds that the ALJ selected the correct onset date.  Because

Greenlee did not have a left arm impairment prior to October 2006, and "[i]n light of the

consistent evidence that [Greenlee] was limited in her right upper extremity," the onset of the left

arm impairment was the tipping point that rendered her disabled.  (D.I. 22 at 27)

The ALJ found that Greenlee's "medically determinable impairments could reasonably be

expected to produce [her] alleged symptoms [prior to October 1, 2006] but . . . the testimony

presented concerning the intensity, persistence and limiting effects of these symptoms are not

entirely credible prior to October 1, 2006."  Tr. at 26.  In selecting October 1, 2006 as the onset

date, the ALJ noted that Greenlee's October 12, 2006 complaint to Dr. Robinson of "a recent

onset of left hand and wrist pain" after falling on October 1 was supported by evidence of muscle

wasting, diminished sensation and diminished grip strength, and that Dr. Robinson's diagnosis of

probable left-side acute carpal tunnel syndrome was confirmed by an EMG.  Tr. at 29.

---

[8]Dr. Robinson's treatment notes from October 12, 2006 state only that Greenlee told him
she "sustained a ground level fall" onto her outstretched left hand "[t]wo weeks ago."  Tr. at 379.

36

SSR 83-20, 1983 WL 31249 (Nov. 30, 1982), describes the SSA's general policy for

determining onset dates.  It requires that the ALJ consider the claimant's allegations, work history,

and the medical evidence in determining the date.  *Id.* at *1.  Where an ALJ determines that

medical or work evidence is not consistent with the onset date alleged by the claimant, "additional

development may be needed to reconcile the discrepancy. . . .  [T]he onset date must be fixed

based on the facts and can never be inconsistent with the medical evidence of record."  *Id.* at *3.

Where the onset date must be inferred from the record, SSR 83-20 continues:

> [t]he available medical evidence should be considered in view of the nature of the
> impairment (i.e., what medical presumptions can reasonably be made about the
> course of the condition).  The onset date should be set on the date when it is most
> reasonable to conclude from the evidence that the impairment was sufficiently
> severe to prevent the individual from engaging in SGA (or gainful activity) for a
> continuous period of at least 12 months or result in death.  Convincing rationale
> must be given for the date selected.

*Id.*

SSR 83-20 further provides that when the onset date must be inferred and is not clear from

the claimant's medical records, "an ALJ in a situation of this kind must call upon the services of a

medical advisor rather than rely on his own lay analysis of the evidence."  *Walton v. Halter*, 243

F.3d 703, 709 (3d Cir. 2001) (finding "no legitimate medical basis" for ALJ's selected onset date

where claimant's impairment was "slowly progressive" and ALJ failed to consult with a medical

advisor).

The ALJ's finding that Greenlee's ground-level fall on her left side was the tipping point

that pushed her into the category of disabled – "[b]eginning on October 1, 2006 . . . the additional

limitations narrow the range of work [Greenlee] could perform to the extent that a finding of 'not

disabled' would be directed," Tr. at 31 – is not supported by a convincing rationale.  The record

37

contains only a fleeting reference in the notes of Dr. Robinson to the fall that occurred on or about October 1. Tr. at 379. Dr. Robinson's diagnosis was that Greenlee suffered from "severe nondominant hand carpal tunnel syndrome due to overuse," not due to the October accident. Tr. at 378 (emphasis added); *see also id.* (Dr. Robinson opining that "progression of [Greenlee's] left carpal tunnel syndrome is directly attributable to the loss of function she has suffered from the right upper extremity"). This diagnosis is supported by the November 2006 EMG report, which, as the ALJ noted, "revealed marked carpal tunnel syndrome on the left with marked progression since a January 2006 study." Tr. at 29 (emphasis added). In other words, the left carpal tunnel syndrome existed no later than January 2006 and progressed over the ensuing ten months.

To be sure, there is some evidence that suggests an onset date in the second half of 2006 may be correct. For instance, during a December 2005 examination, Dr. Dilts found Greenlee's left arm was essentially normal. Tr. at 294. During a January 2006 examination, Greenlee did not make new complaints of left arm pain to Dr. Robinson. Tr. at 384. Then, as the ALJ noted, during a January 30, 2006 evaluation in connection with an EMG Greenlee denied having any left-sided symptoms. Tr. at 27; *see also* Tr. at 392. During an April 2006 consultation with Dr. Yalamanchili, Greenlee again denied left upper extremity symptoms. Tr. at 389.

Ultimately, however, the impact, if any, of Greenlee's October 2006 fall on her left carpal tunnel syndrome – and, more broadly, whether the 2006 fall rendered Greenlee disabled when she was not disabled previously – is not a matter that can be determined based on the existing record. All that is clear is that, at this point, there is not substantial evidence – and no convincing rationale – to justify the ALJ's finding that Greenlee's disability onset date was October 1, 2006. On remand, the Commissioner must revisit the onset date, which may require calling on the

38

services of a medical advisor.  The Commissioner should identify an onset date no earlier than the

last date Greenlee was employed and no later than October 1, 2006.


## CONCLUSION

For the foregoing reasons, Greenlee's motion for summary judgment is granted in part and

denied in part.  The Commissioner's motion for summary judgment is denied.  This matter is

remanded to the Commissioner for further proceedings consistent with this opinion.[9]  An

appropriate order follows.

---

[9]The Court finds no reason to remand this case to a different ALJ than handled it
previously.  Therefore, Greenlee's request for a new ALJ is denied.  It is for the Commissioner to
determine to whom to assign the further remand proceedings required by this opinion.